**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-348 (JDB)** |
| **TYSHEED TUCKER,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.

The defendant comes before the Court after he was previously convicted of possessing a loaded firearm and given the benefit of a suspended sentence with a period of probation. Rather than leading a law-abiding life while on supervision, the defendant committed the instant offense, which involved the possession with intent to distribute a large quantity of drugs. A sentence of 63 months' incarceration followed by a period of five years of supervised release is appropriate given the defendant's criminal history, history of non-compliance while on supervision, and history of violating court orders.

## BACKGROUND

### *The Facts of This Case*

On January 22, 2023, the defendant drove a 2010 Audi and picked up Witness-1, who subsequently sustained a gunshot wound to his foot later that day. After Witness-1 sustained the gunshot wound, the defendant drove him to an apartment on Kenilworth Avenue, Northeast, in Washington D.C., where medical personnel arrived to provide medical assistance for Witness-1. Members of the Metropolitan Police Department ("MPD") arrived in response to the call and the

defendant, Witness-1, and Witness-2 were present inside of the apartment.  The defendant was in possession of a backpack that was subsequently searched, revealing approximately 2.5 pounds of marijuana.  Officers searched the defendant's vehicle, which contained an American Tactical MilSport 300 Blackout firearm with serial number MSA064332 in the backseat, three (3) 10-millimeter pistol magazines along with forty-three (43) rounds of ten millimeter ammunition in the glove compartment, one empty .300 blackout caliber shell casing labeled "GFL 300 BLK," blood splatter on the floor of the passenger seat, a bullet hole by the front passenger glove compartment where the blood splatter was found, identification card belonging to the defendant, and an MCK Micro Conversion Kit inside the trunk of the car. A MCK Micro Conversion Kit can be used to turn a pistol into a shoulder-fired weapon.



*Three 10 Millimeter Magazines and Forty-Three Rounds of 10 Millimeter Ammunition*



*American Tactical MilSport 300 Blackout Firearm with Serial Number MSA064332 in Backseat*



*American Tactical MilSport 300 Blackout Firearm with Serial Number MSA064332*



*MCK Micro Conversion Kit in Trunk*



*MCK Micro Conversion Kit*

DNA testing was conducted on the firearm and three magazines recovered from the defendant's vehicle. With respect to the firearm, the results indicated that it is "1.7 trillion times more likely if TUCKER and three unknown, unrelated people are contributors, than if four unknown, unrelated people are contributors." *See* Exhibit 1, at 2. The level of support for the defendant's inclusion on the firearm was "very strong." With respect to the DNA on the magazines, for Magazine 1, the results indicated that it is "1.4 billion times more likely if TUCKER and two unknown unrelated people are contributors than if three unknown, unrelated people are contributors." The level of support for the defendant's inclusion in the DNA on Magazine 1 was "very strong support." *See* Exhibit 1, at 2. No DNA results could be obtained from Magazine 2, and the defendant was excluded as a contributor to Magazine 3. *See id.*

During a search of Mr. Tucker's person incident to arrest, ninety-nine (99) blue pills, weighing around ten (10) grams, stamped with "M" and "30" ("M30") containing fentanyl were recovered from his front right pocket, separated into two separate plastic bags. In addition, a cell phone was recovered from his back right pocket, a scale was recovered from his back left pocket, and $755.00 in multiple denominations were recovered from his front right and left pockets.

From August of 2022 until the date of his arrest, the defendant used his Instagram account *200_bagss* to advertise counterfeit prescription pills containing fentanyl (at least some of which were the blue M30 pills found on the defendant's person), marijuana, and promethazine syrup to his customers. By way of text message, the defendant and Co-Conspirator-1 conspired to coordinate large purchases of counterfeit fentanyl pills. The defendant and Co-Conspirator-1 had an agreement to distribute at least 957 counterfeit M30 pills containing fentanyl, weighing around 105 grams.

***The Pre-Sentence Investigation Report and Related Facts***

The Presentence Investigation Report (PSR) in this matter summarizes the defendant's history and characteristics.

*The Defendant's Possession of a Loaded Firearm in 2022*

On February 13, 2020, the defendant pled guilty in 2018 CF2 8918 to one count of Carrying a Pistol Without a License in D.C. Superior Court. The court sentenced the defendant to twelve months' incarceration, all of which was suspended, and six months of supervised probation.

The underlying conduct in that matter occurred on June 4, 2018, when officers observed the defendant with another individual fail to pay fare when entering a Metro station. While issuing a citation, officers noticed the defendant's efforts to conceal his waistband and conducted a frisk. Officers felt a firearm in the defendant's waistband and attempted to take the defendant to the ground. The other individual with the defendant pulled the defendant off the ground, assaulted an officer, and fled with the defendant. Law enforcement observed video footage of the defendant abandoning an object on his flight path, and recovered a firearm in the location where he abandoned the object.

Aside from committing the instant offense while on probation in his 2018 matter, the

defendant otherwise failed to comply with the terms of his probation by failing to report for drug testing on nine different occasions and failing to report to CSOSA on three different occasions. On October 20, 2023, the court revoked the defendant's probation.

*The Defendant's 2020 Contempt Conviction*

On June 21, 2021, the defendant plead guilty in 2020 CMD 4683 to one count of Contempt of a Condition of Release in D.C. Superior Court. The court sentenced the defendant to 30 days' incarceration, all of which was suspended, and six months of supervised probation.

The defendant's conviction in this matter arose from a May 14, 2020, incident in which officers saw the defendant on First Street SW, just six days after a court issued a stay away order for the defendant from that location.

On October 20, 2023, the court revoked the defendant's probation.

*The Defendant's 2022 Contempt Conviction*

On July 2, 2022, the defendant pled guilty in 2022 CMD 4045 to one count of Contempt of a Condition of Release in D.C. Superior Court. On October 7, 2022, the court sentenced the defendant to thirty days' incarceration and six months of supervised probation.

This case arose from the defendant's violation of both a barring notice and court-issued stay-away order. Officers observed the defendant in a DC Housing Authority property that was the subject of both the barring notice and the stay-away order. When officers tried to approach the defendant he fled and subsequently resisted arrest.

On October 23, 2023, the court revoked the defendant's probation.

## THE APPLICABLE SENTENCING GUIDELINES

### The Offense Level

U.S. Sentencing Guideline § 2D1.1 governs the count of conviction in this matter. The base

offense level for Count 1 is 24. U.S.S.G. § 2D1.1(c)(12). A two-level increase applies for the defendant's distribution of a controlled substance, fentanyl, through mass-marketing means of an interactive computer service, i.e. his Instagram account. U.S.S.G. § 2D1.1(b)(7).

While the defendant disputes his possession of a firearm in connection with this offense, the evidence supports the application of a two-level increase for the defendant's actual and constructive possession of a firearm. U.S.S.G.  § 2D1.1(b)(1). To apply this enhancement, the government bears the initial burden of proving possession of a weapon by a preponderance of the evidence. *United States v. Bagcho*, 923 F.3d 1131, 1138 (D.C. Cir. 2019). To prove constructive possession, the government must show that the defendant "knew of, and was in a position to exercise dominion and control over" the firearm. *United States v. Dorman*, 860 F.3d 675, 679 (D.C. Cir. 2017). "[T]here must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the [firearm]." *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980). In this case, the DNA results did not exclude the defendant as a contributor to the firearm, and instead indicated that it was "1.7 trillion times more likely if [the defendant] and three unknown, unrelated people are contributors, than if four unknown, unrelated people are contributors" to the DNA on the firearm. Similarly, the DNA results from Magazine 1 indicate that it is "1.4 billion times more likely if [the defendant] and two unknown unrelated people are contributors than if three unknown, unrelated people are contributors." In both cases, the support for the defendant's DNA being included in the DNA on the firearm and magazine was "very strong support." The fact that the defendant's DNA was not just on the firearm, but also on a magazine that would be inserted into the firearm, indicates both that he had actual possession of the firearm and magazine and that he intended to exercise dominion and control over them. Additionally, the fact that the firearm was in the back seat of the

car while the magazines and ammunition were in the glove compartment and the conversion kit was in the trunk. The location of paraphernalia in different places in the vehicle the defendant controlled indicates that the defendant was the individual who exercised dominion and control over the firearm. The DNA evidence in conjunction with the location of the paraphernalia demonstrates by a preponderance of the evidence that the defendant actually and constructively possessed the firearm during a drug-trafficking offense.

Moreover, evidence recovered from the defendant's cell phone further support the application of this enhancement. After the defendant was arrested, the Honorable Moxila A. Upadhyaya signed 23-SW-93, which authorized the government to search the defendant's cell phone for evidence of firearm and drug possession. Subsequent search warrants for the defendant's Instagram and iCloud accounts were also executed. The government has seized over one hundred (100) different web searches performed on the defendant's cell phone from December 31, 2022 to January 19, 2023 (three days before his arrest) related to firearms.  These searches include terms such as "milsport multi cal 300 blackout," the exact type of firearm recovered from his vehicle, which was searched twenty-three (23) times on January 3, 2023.  During this period of time, the defendant also searches for a 30 round magazine for a 300 Blackout. Other searches in this category include terms such as "x13 handgun real life," (searched twenty seven (27) times on January 19, 2023) and "beams for glock 20" (searched twenty five (25) times on December 31, 2022).  Furthermore, the government has seized multiple pictures of firearms from the defendant's Instagram account. For example, on December 12, 2020, Mr. Tucker posted a story[1] on his Instagram featuring a video of a suspected firearm with an extended magazine amongst piles of

---

[1]     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.

cash.  Screenshots of the story are below:

 

Around this same time, on December 31, 2020, the defendant exchanges Instagram direct messages with an associate and attempts to buy the below pistol for $650 dollars:



In another example, the defendant sent a photo via Instagram to an associate on March 22, 2021

9

showing a photograph of a suspected firearm with the caption "Stop playing so much."



The voluminous evidence of firearm possession contained within the defendant's accounts and cell phone support the application of the two-level enhancement. As noted by the Guidelines, this enhancement should be applied unless "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.11. There is no evidence supporting a conclusion that it is clearly improbable that the weapon was connected with this offense, and all the evidence points to the defendant's actual and construction possession of the weapon while committing the instant offense. Therefore, the Court should apply the two-level enhancement under U.S.S.G. § 2D1.1(b)(1).

The defendant's adjusted offense level is 28. The government agrees that the defendant should receive a two-level decrease for demonstrating acceptance of responsibility and a one-level decrease for notifying the government in a timely fashion of his intent to enter a guilty plea.

U.S.S.G. §§ 3E1.1(a); 3E1.1(b). The defendant's total offense level is 25.

***The Criminal History Calculation***

The defendant has the following criminal history:

| No. | Charge/Court | Disposition Date and Sentence | U.S.S.G. § | Criminal History Pts. |
|---|---|---|---|---|
| 1 | Carrying a Pistol Without a License 2018 CF2 8918 (D.C. Superior Court) | 10/07/2022: 12 months ESS all; 3 years of supervised release; 6 months supervised probation; revoked to 12 months incarceration | 4A1.1(b) and 4A1.2(k) | 2 |
| 2 | Contempt – Condition of Release Violation 2020 CMD 4683 (D.C. Superior Court) | 10/7/2022: 30 days ESS all; 6 months supervised probation; Revoked to 30 days incarceration | 4A1.2(c)(1) 4A1.2(k) | 0 |
| 3 | Contempt – Condition of Release Violation 2022 CMD 4045 (D.C. Superior Court) | 10/07/2022: 30 days incarceration, ESS all; 6 months supervised probation; revoked to 30 days incarceration | 4A1.2(c)(1) and 4A1.2(k) | 0 |
| Total | | | | 2 |

The PSR scored his criminal history at 2 points, which places defendant in Criminal History Category II. PSR at 13. The Guideline Range for an offense level 25 in Criminal History Category II is 63 to 78 months. This is a Class B felony, therefore the defendant must be sentenced to a term of supervised release, and the guideline range for supervised release is four to five years. U.S.S.G. §5D1.2(a)(1) and (c). The count of conviction carries a mandatory minimum sentence of 60 months of incarceration and a statutory maximum sentence of 40 years of incarceration. 21 U.S.C. §841(a)(1) and (b)(1)(B)(vi).

The defendant has indicated that believes he is eligible for "safety valve" relief pursuant to

18 U.S.C. § 3553(f), however, the defendant's possession of a firearm during the course of the offense as well as his statements during his debrief with the government, render him ineligible for safety valve relief. 18 U.S.C. §§ 3553(f)(2) and (f)(5). To benefit from the safety valve provision, the defendant bears the burden of proving by a preponderance of the evidence that he did not possess a firearm in connection with his offense. *United States v. Ramirez*, 783 F.3d 687, 692 (7th Cir. 2015). As argued *supra*, the evidence shows the defendant's actual *and* constructive possession of the firearm in connection with the instant offense. During his debrief with the government, the defendant stated that he believes Witness-1 brought the firearm into the vehicle the defendant was driving and that the firearm accidentally discharged, wounding Witness-1. The defendant stated that he never touched the firearm or associated ammunition or magazines found inside his vehicle. He further stated the presence of his DNA on the firearm could be explained by transfer DNA from other objects in the car. This explanation is at odds with the presence of the defendant's DNA on both the firearm and one of the magazines as well as the presence of the firearm paraphernalia in different parts of the defendant's vehicle. Because the evidence shows that the defendant actually and constructively possessed the firearm in connection with his offense, and thus was untruthful during his debrief with the government, the defendant has failed to meet his burden to render him eligible for safety valve relief. *See United States v. Fincher*, 929 F.3d 501 (7th Cir. 2019) (holding that the defendant was not eligible for the safety valve benefit after his DNA was found on a firearm used in furtherance of narcotics trafficking).

## **ARGUMENT**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018).   The

Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.*at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Government recommends that the Court sentence the defendant to 63 months of incarceration followed by five years of supervised release. This sentence reflects the serious nature of this offense, the defendant's history of noncompliance while on supervision, and provides adequate deterrence to others in the community given the proliferation of firearms in our city.

**A.  Nature and Circumstances of the Offense.**

The defendant is before the Court because he conspired to distribute and possess with intent to distribute 40 grams or more of a mixture containing fentanyl. The defendant, by his own admission, used Instagram to distribute counterfeit fentanyl pills in addition to other drugs and entered into a conspiracy to distribute 957 fentanyl pills with Co-Conspirator-1.[2] Given the quantity of pills in the defendant's possession at the time of his arrest, there can be little doubt that he intended to sell those pills as well. While this offense could be viewed as a "mere possessory" offense, selling controlled substances into the community is serious and endangers the health and safety of the citizens of the District of Columbia.

This drug trafficking behavior appears to have been ongoing for nearly three years prior to the defendant's incarceration in this case, with messages beginning as early as Spring of 2020.

The government has seized numerous conversations from the defendant's account that include for example, various instances of the defendant purchasing M30 pills and other pills at wholesale amounts, conversations where with Co-Conspirator-1 where the defendant discusses traveling by commercial airline to purchase pills and marijuana and how to smuggle them through airport security, and the sale of smaller quantities of those pills and marijuana to individual consumers as well as other drug dealers.  Text messages recovered from the defendant's phone show that he purchased 100 blue M30 pills from two different sources on January 17, only five days before he was arrested with 99 blue M30 pills in his pocket.

As part of his drug distribution scheme, the defendant relied heavily on his social media in order to advertise his drugs for sale.  He has been seen, throughout multiple years, frequently

---

[2]     Co-Conspirator-1 was separately prosecuted and convicted of fentanyl distribution in *United States v. Bartwone Copeland*, *et. al.* 22-CR-378 (DLF).  At the time of Co-Conspirator-1's arrest, he had in his possession 957 blue M30 pills containing fentanyl. *See* 22-CR-378 (DLF), ECF No. 113, at 4.

posting pictures of pills (including blue M30 pills), promethazine, and marijuana on his story and then discussing with customers prices and quantities for sale in direct messages.  Screenshots of a handful of these stories and their respective dates of posting are below:



*December 12, 2020*      *January 30, 2021*      *September 27, 2022*



*October 28, 2020*[3]      *January 1, 2021*      *September 18, 2022*[4]

---

[3]    A "KD" is slang for 3.5 grams of marijuana.  The term is derived from professional basketball player Kevin Durant, who wears the number 35.

[4]    An expletive has been redacted from this image.



*December 11, 2020*          *January 6, 2021*          *January 7, 2021*[5]

As part of his offense, the defendant also possessed a firearm as well as forty-three rounds of ammunition and a conversion kit. Our courts have repeatedly warned against discounting the inherent danger associated with loaded firearms. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7–8 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"). And Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from ten years to fifteen years. A loaded firearm is a deadly weapon. It has the ability with a single pull of the action to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter.

---

[5]      "Wock" refers to promethazine syrup.  The term is shorthand for a company called Wockhardt that produces a brand of promethazine.  "Iykyk" is shorthand for "If you know, you know."

17

Given the large quantity of drugs possessed by the defendant in conjunction with his possession of a firearm, the nature and circumstances of the offense warrants a significant term of incarceration.

**B.  The History and Characteristics of the Defendant.**

The defendant's criminal history and noncompliance with probation supervision and court orders indicates that he requires a long period of incarceration. In October of 2022, the defendant was sentenced following a conviction for his possession of a loaded firearm. The court in that matter gave the defendant the benefit of a fully suspended sentence, and the defendant chose to use that opportunity to engage in further criminal conduct. Less than three months after receiving his sentence, while on probation supervision, he committed the instant offense, which involved both the possession of a large quantity of drugs along with a firearm. In addition to engaging in criminal conduct, his probation officer reported that he was not complying with the terms of his probation by failing to report to drug testing and failing to report to CSOSA. In addition to his failure to comply with the terms of his probation, the defendant pled guilty in two separate cases to violating court orders.

The defendant's history of engaging in conduct involving possessing firearms as well as his unwillingness to comply with court orders or supervision weigh in favor of a lengthy period of incarceration.

**C.  The Need for the Sentence Imposed.**

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence:  it will keep our community safe from the defendant for a significant period.

This sentence provides general deterrence:  it will signal to the community that the

possession of controlled substances are a serious matter and hopefully deter others from doing so.

## **CONCLUSION**

For all of the foregoing reasons, the Government respectfully requests that this Court sentence the defendant to a term of imprisonment of 63 months followed by five years of supervised release.

<div style="margin-left:40%">

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

*/s/ Justin F. Song*
Justin F. Song
N.Y. Bar No. 5626379
Assistant United States Attorneys
601 D Street N.W.
Washington, D.C. 20530
202-227-9109
Justin.Song@usdoj.gov

</div>